# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

CHRISTINE J. WHITE,        )
                                  )
      Plaintiff,         )
                                  )
V.                         )      **Case No. 2:14CV55NCC**
                                  )
CAROLYN W. COLVIN,      )
Acting Commissioner of Social Security,)
                                  )
      Defendant.      )

## MEMORANDUM AND ORDER

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner denying the application of Christine J. White (Plaintiff) for Supplemental Security Income (SSI), under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 et seq. Plaintiff has filed a brief in support of the Complaint. (Doc. 13). Defendant has filed a brief in support of the Answer. (Doc. 18). The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(c). (Doc. 8).

## I.
## PROCEDURAL HISTORY

On June 10, 2011, Plaintiff filed an application for SSI, alleging a disability onset date of January 15, 2011. (Tr. 11, 67, 135). Her application was denied initially, and she requested a hearing before an Administrative Law Judge (ALJ).

(Tr. 67, 75-79, 82). After a hearing, by decision dated June 11, 2013, the ALJ found Plaintiff not disabled. (Tr. 11-25, 30-66). On April 1, 2014, the Appeals Council denied Plaintiff's request for review. (Tr. 1-6). As such, the decision of the ALJ stands as the final decision of the Commissioner.

## II.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari,

250 F.3d 603, 605 (8th Cir. 2001) (citing <u>Nguyen v. Chater</u>, 75 F.3d 429, 430-31 (8th Cir. 1996)).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); pt. 404, subpt. P, app. 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. <u>See</u> <u>id.</u>

Fourth, the impairment must prevent the claimant from doing past relevant work. 20 C.F.R. §§ 416.920(f), 404.1520(f). The burden rests with the claimant at this fourth step to establish his or her Residual Functional Capacity (RFC). <u>See</u> <u>Steed v. Astrue</u>, 524 F.3d 872, 874 n.3 (8th Cir. 2008) ("Through step four of this analysis, the claimant has the burden of showing that she is disabled."); <u>Eichelberger</u>, 390 F.3d at 590-91; <u>Masterson v. Barnhart</u>, 363 F.3d 731, 737 (8th Cir. 2004); <u>Young v. Apfel</u>, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f).

Fifth, the severe impairment must prevent the claimant from doing any other work. 20 C.F.R. §§ 416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to show evidence of other jobs in the national economy that can be performed by a person with the claimant's

RFC. See Steed, 524 F.3d at 874 n.3; Young, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Id. See also Harris v. Barnhart, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."); Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) ("[T]he burden of production shifts to the Commissioner at step five to submit evidence of other work in the national economy that [the claimant] could perform, given her RFC."). Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the decision must be affirmed if it is supported by substantial evidence. See Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). See also Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007). In Bland v. Bowen, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> The concept of substantial evidence is something less than the weight
> of the evidence and it allows for the possibility of drawing two

> inconsistent conclusions, thus it embodies a zone of choice within
> which the Secretary may decide to grant or deny benefits without
> being subject to reversal on appeal.

See also Lacroix v. Barnhart, 465 F.3d 881, 885 (8th Cir. 2006) ("[W]e may not

reverse merely because substantial evidence exists for the opposite decision.")

(quoting Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)); Hartfield v.

Barnhart, 384 F.3d 986, 988 (8th Cir. 2004) ("[R]eview of the Commissioner's

final decision is deferential.").

It is not the job of the district court to re-weigh the evidence or review the

factual record de novo. See Cox, 495 F.3d at 617; Guilliams v. Barnhart, 393 F.3d

798, 801 (8th Cir. 2005); McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1993);

Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court

must simply determine whether the quantity and quality of evidence is enough so

that a reasonable mind might find it adequate to support the ALJ's conclusion. See

Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228

F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function of the ALJ,

who is the fact-finder. See Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).

See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an

ALJ's decision is conclusive upon a reviewing court if it is supported by

"substantial evidence"). Thus, an administrative decision which is supported by

substantial evidence is not subject to reversal merely because substantial evidence

may also support an opposite conclusion or because the reviewing court would have decided differently.   See Krogmeier, 294 F.3d at 1022.   See also Eichelberger, 390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001).

To determine whether the Commissioner's final decision is supported by substantial evidence, the court is required to review the administrative record as a whole and to consider:

(1) Findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

Additionally, an ALJ's decision must comply "with the relevant legal requirements." Ford v. Astrue, 518 F.3d 979, 981 (8th Cir. 2008).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A). "While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). When evaluating evidence of pain, the ALJ must consider:

(1) the claimant's daily activities;

(2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;

(3) any precipitating or aggravating factors;

(4) the dosage, effectiveness, and side effects of any medication; and

(5) the claimant's functional restrictions.

Baker v. Sec'y of Health & Human Servs., 955 F.2d. 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322.

The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. See id. The ALJ must also consider the plaintiff's prior work record, observations by third parties and treating

and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing.  See Polaski, 739 F.2d at 1322; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him or her to reject the plaintiff's complaints.  See Guilliams, 393 F.3d at 801; Masterson, 363 F.3d at 738; Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995).  It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he or she considered all of the evidence.  Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992); Butler v. Sec'y of Health & Human Servs., 850 F.2d 425, 429 (8th Cir. 1988).  The ALJ, however, "need not explicitly discuss each Polaski factor."  Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004).  See also Steed, 524 F.3d at 876 (citing Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000)).  The ALJ need only acknowledge and consider those factors.  See id.  Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence.  See Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a)(1), and includes an assessment of physical abilities and mental impairments.  20 C.F.R. § 404.1545(b)-(e).  The Commissioner must show

that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy.  See Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006); Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-47 (8th Cir. 1982) (en banc)).  The Commissioner must first prove that the claimant retains the RFC to perform other kinds of work.  See Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857.  The Commissioner has to prove this by substantial evidence.  Warner v. Heckler, 722 F.2d 428, 431 (8th Cir. 1983).  Second, once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities.  See Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857.

To satisfy the Commissioner's burden, the testimony of a vocational expert (VE) may be used.  An ALJ posing a hypothetical to a VE is not required to include all of a plaintiff's limitations, but only those which the ALJ finds credible.  See Goff, 421 F.3d at 794 ("[T]he ALJ properly included only those limitations supported by the record as a whole in the hypothetical."); Rautio, 862 F.2d at 180.  Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the plaintiff's subjective complaints of pain for legally sufficient reasons.  See Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006); Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990); Hutsell v. Sullivan, 892 F.2d 747, 750 (8th Cir. 1989).

# III.
# DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. <u>See</u> <u>Onstead</u>, 962 F.2d at 804. Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm her decision as long as there is substantial evidence in favor of the Commissioner's position. <u>See</u> <u>Cox</u>, 495 F.3d at 617; <u>Krogmeier</u>, 294 F.3d at 1022.

Plaintiff alleged disability based on degenerative disc disease, left ankle pain, bipolar disorder, depression, anxiety, sleep and concentration trouble, muscle spasms in her back, and pain. Plaintiff, who was thirty-six years old at the time of the hearing, testified that she lived with her boyfriend; she lost custody of her two children two years prior to the hearing due to her anger problems, which included snapping at and hitting her children; at the time of the hearing, she could have unsupervised visits with her children; she completed the twelfth grade and had been in special education classes; she believed she could read at the tenth grade level; she lost her last job as a laundry worker because her employer thought she was "incompetent" and used the bathroom excessively; and, at her laundry job, she used the bathroom three to four times an hour. (Tr. 34-41). Plaintiff also testified that she had three good days a week, during which she could read, clean her house, cook, watch television, sew, fish, bird watch and tend to plants, and that she had

two bad days a week, during which she was extremely moody, kept her distance from others, and yelled at others when they spoke to her.  (Tr. 50-51).

The ALJ found Plaintiff had not engaged in substantial gainful activity since June 10, 2011; that she had the severe impairments of degenerative disc disease of the lumbar spine, obesity, major depressive disorder, and post-traumatic stress disorder (PTSD); and that Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment.  The ALJ found Plaintiff had the following RFC:  Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; she could sit, stand and walk, with normal breaks, for a total of 6 hours in an 8-hour workday; she could push and pull within these limitations; she could occasionally climb ramps and stairs, but never ladders, ropes or scaffolds; she could occasionally stoop, kneel, crouch, and crawl; she was limited to low stress work, defined as simple, routine, repetitive tasks in a relatively static environment with few changes, and no fast production pace or stringent production quotas; and she worked better with things than with people, but could have occasional and superficial interaction with others, as long as there was no interaction with the public.  The ALJ solicited the testimony of a VE, who testified that Plaintiff could not perform her past relevant work, but that there was work in the national economy which a person of Plaintiff's age, and with her education,

work experience and RFC could perform.  As such, the ALJ found that Plaintiff was not disabled within the meaning of the Act.  (Tr. 13-24).

Plaintiff contends that the ALJ's decision is not based on substantial evidence because:  The ALJ did not accord controlling weight to Plaintiff's treating doctor, David Goldman, D.O.; the ALJ did not find Plaintiff's mental impairment met Listing 12.04 or Listing 12.06; the ALJ failed to fully develop the record in that he did not order IQ testing; and the ALJ failed to give proper weight to Third Party Reports from Plaintiff's friends, Barbara Bright and James Bright. For the following reasons, the court finds Plaintiff's arguments are without merit and that the ALJ's determination that Plaintiff is not disabled is based on substantial evidence and is consistent with the Regulations and case law.

## A.    Plaintiff's Credibility:

The court will first address the ALJ's credibility determination as the ALJ's credibility determination is relevant to arguments Plaintiff makes in support of her contention that the ALJ's decision is not based on substantial evidence.  See Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010) ("[The plaintiff] fails to recognize that the ALJ's determination regarding her RFC was influenced by his determination that her allegations were not credible.") (citing Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005)); 20 C.F.R. §§ 404.1545, 416.945 (2010).  As set forth more fully above, the ALJ's credibility findings should be affirmed if they are

supported by substantial evidence on the record as a whole; a court cannot substitute its judgment for that of the ALJ.  See Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Hutsell, 892 F.2d at 750; Benskin, 830 F.2d at 882.

To the extent that the ALJ did not specifically cite Polaski, other case law, and/or Regulations relevant to a consideration of Plaintiff's credibility, this is not necessarily a basis to set aside an ALJ's decision where the decision is supported by substantial evidence.  Randolph v. Barnhart, 386 F.3d 835, 842 (8th Cir. 2004); Wheeler v. Apfel, 224 F.3d 891, 895 n.3 (8th Cir. 2000); Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996); Montgomery v. Chater, 69 F.3d 273, 275 (8th Cir. 1995).  Additionally, an ALJ need not methodically discuss each Polaski factor if the factors are acknowledged and examined prior to making a credibility determination; where adequately explained and supported, credibility findings are for the ALJ to make.  See Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000).  See also Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each Polaski factor as long as the analytical framework is recognized and considered."); Strongson, 361 F.3d at 1072; Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996).

In any case, "[t]he credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."  Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001).  "If an ALJ explicitly discredits the claimant's

testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." <u>Gregg v. Barnhart</u>, 354 F.3d 710, 714 (8th Cir. 2003). <u>See also</u> <u>Halverson v. Astrue</u>, 600 F.3d 922, 932 (8th Cir. 2010); <u>Cox v. Barnhart</u>, 471 F.3d 902, 907 (8th Cir. 2006). For the following reasons, the court finds that the reasons offered by the ALJ in support of his credibility determination are based on substantial evidence.

First, the ALJ considered Plaintiff's poor work history. (Tr. 18). A long and continuous past work record with no evidence of malingering is a factor supporting credibility of assertions of disabling impairments. <u>See</u> <u>Allen v. Califano</u>, 613 F.2d 139, 147 (6th Cir. 1980). For the same reason, an ALJ may discount a claimant's credibility based upon her poor work record. <u>See</u> <u>Buckner v. Astrue</u>, 646 F.3d 549, 558 (8th Cir. 2011) (where the ALJ did not err in evaluating Plaintiff's credibility in finding that Plaintiff's "sporadic work history prior to his alleged disability date indicate[d] that he was not strongly motivated to engage in meaningful productive activity even prior to the alleged onset date of disability and weigh[ed] against his credibility in assigning reasoning for not working") (internal quotation marks omitted); <u>Ellis v. Barnhart</u>, 392 F.3d 988, 996 (8th Cir. 2005) (ALJ may properly consider claimant had not worked for several years before filing SSI application); <u>Ownbey v. Shalala</u>, 5 F.3d 342, 344 (8th Cir. 1993). <u>See also</u> <u>Fredrickson v. Barnhart</u>, 359 F.3d 972, 976 (8th Cir. 2004) (ALJ properly found claimant not

credible due in part to his sporadic work record reflecting relatively low earnings and multiple years with no reported earnings); Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). Work history is only factor among many for an ALJ to consider. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 969 (8th Cir. 2003). In particular, the ALJ considered that Plaintiff's work record showed that she never came close to working at a full-time level; that she had not attempted to work since 2004; that an award of SSI at the full rate would result in Plaintiff's having a higher income than she ever earned; and that such a scenario could motivate Plaintiff, either consciously or subconsciously, to exaggerate her symptoms. (Tr. 18, 146-47).

Second, the ALJ considered that Plaintiff reported that her medications, including Celexa, Prozac, and Lexapro, helped her mental issues. (Tr. 18-19, 20). Conditions which can be controlled by treatment are not disabling. See Renstrom v. Astrue, 680 F.3d 1057, 1066 (8th Cir. 2012) (quoting Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010)); Davidson v. Astrue, 578 F.3d 838, 846 (8th Cir. 2009); Medhaug v. Astrue, 578 F.3d 805, 813 (8th Cir. 2009); Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (holding that if an impairment can be controlled by treatment, it cannot be considered disabling). Indeed, on August 23, 2010, Plaintiff told her health care provider that she thought her medications "helped some." (Tr.

300).  Notably, when Plaintiff presented for back pain, in August 2010, it was reported that she "tolerated treatment well."  (Tr. 298).

Records of June 20, 2011, reflect that Plaintiff said she felt much better on Lexapro; that her blood pressure had improved with an increased dosage of Lisinopril; and that she was sleeping better with medication and had no hangover effect in the morning.  Further, as considered by the ALJ, in July 2011, when Plaintiff was hospitalized due to a suicide attempt, her Global Assessment of Functioning (GAF) was 35, but, with treatment, upon discharge, her GAF was 50.[1] (Tr. 19, 462, 465).  On the day of her discharge from the hospital, July 25, 2011,

_____

[1] Global assessment of functioning ("GAF") is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations.  See Diagnostic and Statistical Manual of Mental Disorders, DSM-IV, 30-32 (4th ed. 1994).  Expressed in terms of degree of severity of symptoms or functional impairment, GAF scores of 31 to 40 represent "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood," 41 to 50 represents "serious," scores of 51 to 60 represent "moderate," scores of 61 to 70 represent "mild," and scores of 90 or higher represent absent or minimal symptoms of impairment.  Id. at 32.  See also Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010) ("[A] GAF score of 65 [or 70] . . . reflects 'some mild symptoms (e.g. depressed mood or mild insomnia) OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships.'") (quoting Kohler v. Astrue, 546 F.3d 260, 263 (2d Cir. 2008) (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) (alterations in original).  See also Goff, 421 F.3d at 791, 793 (affirming where court held GAF of 58 was inconsistent with doctor's opinion that claimant suffered from extreme limitations; GAF scores of 58-60 supported ALJ's limitation to simple, routine, repetitive work).

Plaintiff told Dr. Goldman that she liked Lexapro and that it "really work[ed]." When she suggested that Lexapro caused a problem with her concentration, Dr. Goldman suggested Plaintiff split her dosage between the morning and the afternoon, which suggestion Plaintiff thought was "good." (Tr. 380-81). As further considered by the ALJ, despite Plaintiff's reporting on this date that medication gave her minimal relief for back pain, there were no specific objective findings in regard to Plaintiff's back condition at this time. (Tr. 19, 266).

Records of November 2011 reflect that Plaintiff said she had no side effects from her medications and that her medication efficacy was "fair." (Tr. 378). On January 11, 2012, Plaintiff reported that medication helped her, and her therapist noted that Plaintiff had a good response to medication, with no side effects. (Tr. 377). On January 20, 2012, Plaintiff said that both Lexapro and Seroquel were helping, and the therapist again reported that Plaintiff had a good response to medication, with no side effects. (Tr. 376). Also, on February 28, 2012, it was reported that Plaintiff's blood pressure was controlled. (Tr. 433).

Third, the ALJ considered that observations and records of Plaintiff's mental health providers were inconsistent with Plaintiff's claims regarding the severity of her symptoms. (Tr. 18-21). See Halverson v. Astrue, 600 F.3d 922, 933 (8th Cir. 2010) (doctor's observations were inconsistent with claimant's allegations of disability). "[A]n ALJ may disbelieve a claimant's subjective reports of pain

because of inconsistencies or other circumstances." Eichelberger, 290 F.3d at 589. In this regard, the ALJ considered that, when Plaintiff presented with mental health complaints, in September 2010, the examiner noted that Plaintiff dressed appropriately; that she had normal hygiene; that she had clear and goal directed thoughts; that there was no evidence of disturbance of perception or thought; and that Plaintiff was pleasant and cooperative and oriented. The ALJ further considered that the most negative findings on that date were that Plaintiff had only fair remote and recent memory and her affect was bland. (Tr. 18, 246).

As considered by the ALJ, Plaintiff was hospitalized from July 19 to July 25, 2011, due to an overdose of medication. Upon admission, Plaintiff reported that she overdosed, as a suicide attempt, due to "the stress which she [was] currently living relating to continuing problems with her current husband." (Tr. 461) Examination showed that Plaintiff was oriented, exhibited no signs or symptoms of psychosis or formal thought disorder; she denied hallucinations; she was judged to have borderline intelligence with a limited fund of information; and she had no conspicuous signs of anxiety or depression. (Tr. 461). Upon discharge, it was reported that Plaintiff's mood and affect had improved on a daily basis; she had been an active participant in "the milieu and found counseling sessions to be helpful"; and she denied suicidal thoughts and feelings. (Tr. 465).

When Plaintiff underwent a mental health assessment with Dr. Goldman on July 25, 2011, Dr. Goldman noted that Plaintiff maintained good eye contact, displayed no psychomotor agitation or psychomotor retardation, and her speech was loquacious but she had no eccentricities of rate, rhythm, or amplitude. Dr. Goldman also reported that a mental status examination showed that Plaintiff was oriented; Plaintiff correctly identified the current and past two United States presidents; Plaintiff denied hallucinations, although she thought there were poltergeists living in the house she shared with her boyfriend; Plaintiff denied being suicidal; and Plaintiff told Dr. Goldman she was "actually a lot better now." Dr. Goldman's impression was PTSD, "[m]ajor depressive disorder, recurrent, moderate to severe." (Tr. 380-82).

Additionally, on August 18, 2011, Plaintiff reported to Dr. Goldman that things were going "better."[2] Records reflect that Plaintiff had normal appearance, behavior, activity level, orientation, speech, affect, thought process, insight, judgment, cognition, and impulse control and no delusions or hallucinations on this date. (Tr. 379). On September 9, 2011, Plaintiff's caseworker reported that Plaintiff said she had done her homework and had written a list of positive things about herself once a day for seven days, that she had started going back to a church choir, and that she was remembering to take her medications. (Tr. 407). On

_____

[2] The ALJ mistakenly stated this visit took place on August 28, 2011. (Tr. 20).

September 16, 2011, Plaintiff told her caseworker that she was in a "great mood" and that she was going to visit her brother and would not be at their next meeting. (Tr. 406). On October 14, 2011, Plaintiff told her case worker that her trip to see her brother was "very good"; that she had "some mood swings"; and that it "really help[ed] having someone to help her pin point where [her mood swings] were coming from." (Tr. 403).

The ALJ also considered that, at a November 2011 examination, which was about two months prior to Plaintiff's alleged onset date, Plaintiff presented as "very upbeat" and talkative and maintained good eye contact. (Tr. 18). Notably, on November 30, 2011, although Plaintiff said she was experiencing nightmares and that she had not been sleeping well, even with Seroquel, Dr. Goldman reported that Plaintiff's appearance, behavior, activity level, orientation, speech, affect, thought process, insight, judgment, cognition, and impulse control were normal. It was also reported, on this date, that aggression was absent; Plaintiff was not a suicide risk; and she did not have psychosis. (Tr. 378). On January 11, 2012, the only abnormality noted by Dr. Goldman, pursuant to a mental status examination, was that Plaintiff was loquacious (Tr. 377), and, on January 20, 2012, when Plaintiff said she did not want to go out in public places, Dr. Goldman noted Plaintiff had normal appearance, behavior, activity level, orientation, speech, affect, thought process, insight, judgment, cognition, and impulse control (Tr. 376).

Also, Dr. Goldman noted, on January 11 and 20, 2012, that aggression was absent, and Plaintiff had no psychosis and was not a suicide risk or a risk to others. (Tr. 376-77).

Fourth, Plaintiff was prescribed ibuprofen and given a non-invasive "low amplitude" technique (manual manipulation) for her back pain, which treatment she repeatedly tolerated well. (Tr. 298, 328, 433, 442). See Constock v. Chater, 91 F.3d 1143, 1147 (8th Cir. 1996) (upon discrediting the claimant's allegations of back pain, ALJ properly considered that Plaintiff took aspirin, used a whirlpool tub, and had his wife rub ointment on his back to relieve pain); Benskin v. Bowen, 830 F.2d 878, 884 (8th Cir. 1987) (holding that disabling pain not indicated when claimant merely took hot showers and used Advil and aspirin to relieve pain). Also, at the time of the April 2013 hearing, Plaintiff testified that she was not receiving treatment for her back, although she had a medical card, and had not seen her doctor for her back since October 2011, when he retired. (Tr. 55). A lack of regular treatment for an alleged disabling condition detracts from a claimant's credibility. See Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006) (upholding an ALJ's determination that a claimant lacked credibility due in part to "absence of hospitalizations . . ., limited treatment of symptoms, [and] failure to diligently seek medical care"); 20 C.F.R. § 404.1529(c)(3)(v) (the agency will consider the

claimant's treatment when evaluating her symptoms): Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000).

Fifth, the ALJ considered observations of Plaintiff's medical providers and objective medical evidence relevant to Plaintiff's pain and physical conditions. (Tr. 18-21). See 20 CFR § 404.1529(c)(2) (agency will consider "objective medical evidence" when evaluating symptoms); Halverson v. Astrue, 600 F.3d 922, 933 (8th Cir. 2010) (doctor's observations were inconsistent with claimant's allegations of disability); Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006) (ALJ may find claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary).

In particular, that when Plaintiff presented on February 28, 2011, examination showed no focal deficits, normal patella reflexes, intact sensation, intact strength with flexion and extension, negative straight leg raise, and mild tenderness to palpation in the midline of the lower lumbar spine, and that the remainder of Plaintiff's back was non-tender. (Tr. 18, 253). Notably, records of this date reflect that Plaintiff denied urinary frequency and focal neurological symptoms, and that examination additionally showed no clubbing, cyanosis or edema in Plaintiff's extremities. (Tr. 253). A February 28, 2011 lumbar spine x-ray showed degenerative disc disease at L5-S1 and was otherwise unremarkable; the impression was "*mild* degenerative disc disease at L5-S1, *without any acute*

*abnormality*."  (Tr. 255) (emphasis added).  Also, when Plaintiff was hospitalized in July 2011, Plaintiff reported no hearing or visual deficits, no neck pain or swallowing difficulty, no ankle edema, no urinary dysfunction, no myalgias or arthralgias, and no motor or sensory deficits.  On examination, Plaintiff had normal range of motion (ROM) in her extremities and neck, her neck was supple, and she had no apparent sensory or motor deficits.  (Tr. 462).

As considered by the ALJ, Plaintiff underwent a physical consultative examination, in August 2011, conducted by Gregory Henry, D.O.  Dr. Henry reported that Plaintiff had an "entirely normal" gait pattern, walked without an assistive device, did not stagger, showed good heel to toe gait, had brisk and equal reflexes, did not complain of numbness, had no neuromuscular deficits, exhibited no atrophy, demonstrated no hearing deficit, and had no sensory deficits, motor reflex deficits, muscle spasm, or particular muscle tenderness, although she was a bit tender in the lumbosacral region and left sacroiliac joints with palpation.  Dr. Henry also reported that the motion in Plaintiff's back was "significantly normal" and her limitation in flexion related to tightness in the hamstrings.  Dr. Henry opined that Plaintiff had no impairment that would preclude her from sitting, standing, walking, lifting, and carrying objects, and that Plaintiff's ability to handle objects was not impaired.  Dr. Henry also reported that, from a physical standpoint,

Plaintiff ambulated well; the use of her hands was not impaired; and she was well able to tolerate lifting and carrying objects in the light range.  (Tr. 359-60).

On January 9, 2012, when Plaintiff was seen for a six-month check-up, she reported that her back pain had been worse in the prior to weeks, but that her left sacral spasm was "corrected with indirect counterstrain technique" (manual manipulation) which procedure she tolerated well.  (Tr. 442).  Examination, on February 28, 2012, showed no ankle edema.  (Tr. 432-33).  On September 5, 2012, Plaintiff presented with low back pain, and she received manual treatment which she tolerated well.  (Tr. 428).  When Plaintiff presented, on October 17, 2012, for abdominal pain, a physical exam showed that she appeared well, with no respiratory or cardiac problems.  (Tr. 424).

Sixth, the ALJ considered that, although a June 2011 treatment record noted rapid mood changes around 4:00 p.m. everyday, this appeared to be by Plaintiff's self-reporting.  (Tr. 18, 270).  Cf. Blakeman v. Astrue, 509 F.3d 878, 882 (8th Cir. 2007) ("The issue is not whether [the claimant] was credible in testifying that he naps each weekday afternoon he is not working.  The issue is whether his heart condition compels him to nap each afternoon.").

Seventh, as discussed above, when Plaintiff was hospitalized in July 2011 due to a suicide attempt, she complained she overdosed because of stress caused by problems with her current husband.  She also reported that her "primary problem

[was] [a] continuing struggle[] with her current husband. (Tr. 461). Indeed, situational depression is not disabling. See Dunahoo v. Apfel, 241 F.3d 1033, 1039-40 (8th Cir. 2001) (holding that depression was situational and not disabling because it was due to denial of food stamps and workers compensation and because there was no evidence that it resulted in significant functional limitations).

Eighth, the ALJ considered Plaintiff's noncompliance with prescribed medical treatment. In particular, the ALJ considered that Plaintiff often missed doctors' appointments and that her doing so did not enhance her credibility. (Tr. 20, 379). See Eichelberger, 390 F.3d at 589 (holding that the ALJ properly considered that the plaintiff cancelled several physical therapy appointments and that no physician imposed any work-related restrictions on her) (citing Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996) (claimant's failure to comply with prescribed medical treatment is inconsistent with complaints of disabling pain). See also Wildman v. Astrue, 596 F.3d 959, 968-69 (8th Cir. 2010) (it is permissible for ALJ to consider claimant's noncompliance with prescribed medical treatment).

As specifically considered by the ALJ, on August 18, 2011, Plaintiff admitted that she changed, of her own volition, the dosage of her Lexapro. (Tr. 379). An August 22, 2011 record reflects that Plaintiff could not be contacted because her voicemail was full. (Tr. 20, 410). Plaintiff cancelled a counseling

appointment, on September 30, 2011, due to the flu; she scheduled for the next week; and records of October 7 2011, reflect that she again cancelled stating she had the flu and strep. (Tr. 20, 404-405). On October 21, 2011, Plaintiff called her mental health case worker and stated she would not be home for her meeting scheduled for that date. (Tr. 402).

Subsequently, on December 2, 2011, Plaintiff's mental health case worker reported that she tried to go to the weekly meeting that had been scheduled with Plaintiff, but that there was no answer at the door or on the phone, so she left a note stating that she would be back the next week. (Tr. 20, 397). The next week, December 9, 2011, the same thing happened; there was no answer when the mental health case worker arrived for Plaintiff's weekly meeting. (Tr. 20, 396). When Plaintiff's mental health case worker arrived at Plaintiff's house on January 6, 2012, Plaintiff's boyfriend answered the door and said they were getting ready to leave; he told the case worker that "from now on [Plaintiff's] visitations with her sons [were] not to be discussed in [their] home any longer." (Tr. 20, 395).

In a January 24, 2012 review of Plaintiff's progress, Plaintiff's mental health case worker noted that Plaintiff had "not been following through with her CSS to work on goals on her treatment plan. She ha[d] seen the CSS a couple of times during the quarter and [did] not seem to want to make any progress forward." The caseworker also noted that Plaintiff's doctor had suggested reinstating therapy, but

that Plaintiff had not followed through with that suggestion. (Tr. 411). Then, on February 3, 2012, Plaintiff's mental health case worker reported that, when she went to her weekly meeting with Plaintiff, there was no answer at the door or on the phone. (Tr. 391). The ALJ also considered that, although Plaintiff testified at the hearing that her mental health case worker was often late to appointments (Tr. 58), Plaintiff did not provide a reason why she could not stay and wait for her, and there was no indication that Plaintiff called to report the caseworker's tardiness or difficulty with timely meetings (Tr. 20).

To the extent Plaintiff argues that the ALJ erred in considering her noncompliance with prescribed treatment, see Pate-Fires v. Astrue, 564 F.3d 935, 945 (8th Cir. 2009) ("[F]ederal courts have recognized a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the 'result of [the] mental impairment [itself] and, therefore, neither willful nor without a justifiable excuse.'") (citing Mendez v. Chater, 943 F. Supp. 503, 508 (E.D. Pa. 1996)), as noted by the ALJ, Plaintiff fails to cite evidence expressly linking her mental limitations with her noncompliance, see Jones v. Astrue, 2010 WL 3782143, at *2 (W.D. Mo. Sept. 22. 2010) (unpublished) ("Plaintiff cites to no evidence in the record demonstrating she cannot comply with taking her medication because of her mental limitations. Without such evidence, the Court cannot find the ALJ erred in factoring in Plaintiff's noncompliance."). Moreover,

in <u>Wildman v. Astrue</u>, 596 F.3d 959, 965 (8th Cir. 2010), the Eighth Circuit distinguished depression, which Plaintiff had, from schizophrenia or psychotic disorders with respect to noncompliance.

Ninth, in October 2012, it was recommended that Plaintiff engage in regular physical and aerobic activity. (Tr. 424). <u>Cf.</u> <u>Pirtle v. Astrue</u>, 479 F.3d 931, 935 (8th Cir. 2007) (claimant's ability to homeschool her two children was inconsistent with allegation of disability).

Tenth, the ALJ considered that he did not observe any pain symptoms at the hearing. (Tr. 21-22). While an ALJ cannot accept or reject subjective complaints *solely* on the basis of personal observations, <u>see</u> <u>Ward v. Heckler</u>, 786 F.2d 844, 847-48 (8th Cir. 1986), an ALJ's observations of a claimant's appearance and demeanor during the hearing is a consideration, <u>see</u> <u>Steed v. Astrue</u>, 524 F.3d 872, 876 (8th Cir. 2008) (holding that an ALJ "is in the best position" to assess credibility because he is able to observe a claimant during his testimony).

Eleventh, the ALJ considered Plaintiff's daily activities, including her stating that, on good days, she sewed, went fishing, watched birds, and worked with plants, showed that she could "focus quite a bit," as these activities all require attention and concentration. The ALJ also noted that although Plaintiff said she could not watch a movie due to an inability to focus, she also testified that she watched a soap opera mid-day. (Tr. 21). The court notes that Plaintiff testified

that she could read at a tenth grade level; she read the comics and the weather in the newspaper; she went to the grocery store with her boyfriend; she went to the butcher shop and Casey's General Store; she watched the news on television; she did house cleaning; and she met her boyfriend online and in person at the library. (Tr. 38-39, 48-50, 53, 59). Indeed, the ALJ noted that Plaintiff's stating that she met her boyfriend in the library and records, reflecting she was frequently not at home, contradicted her testimony that she did not like to go out in public. (Tr. 22).

While the undersigned appreciates that a claimant need not be bedridden before she can be determined to be disabled, Plaintiff's daily activities can nonetheless be seen as inconsistent with her subjective complaints of a disabling impairment and may be considered in judging the credibility of complaints. See McDade v. Astrue, 720 F.3d 994, 998 (8th Cir. 2013) (ALJ properly discounted plaintiff's credibility where, among other factors, plaintiff "was not unduly restricted in his daily activities, which included the ability to perform some cooking, tak[ing] care of his dogs, us[ing] a computer, driv[ing] with a neck brace, and shop[ping] for groceries with the use of an electric cart"); Eichelberger, 390 F.3d at 590 (ALJ properly considered that plaintiff watched television, read, drove, and attended church upon concluding that subjective complaints of pain were not credible). Indeed, the Eighth Circuit holds that allegations of disabling "pain may be discredited by evidence of daily activities inconsistent with such allegations."

Davis v. Apfel, 239 F.3d 962, 967 (8th Cir. 2001). "Inconsistencies between [a claimant's] subjective complaints and her activities diminish her credibility." Goff, 421 F.3d at 792.

**B.    Intellectual Testing:**

Because the record did not include any recent IQ testing for Plaintiff, she argues that the ALJ should have ordered such testing. For the following reasons the court finds Plaintiff's argument without merit and that the ALJ was not required to order that Plaintiff undergo IQ testing.

First, an ALJ is required to order medical examinations and tests only where the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled. See Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005) (the duty to develop the record further only arises where "a crucial issue is undeveloped"); Landess v. Weinberger, 490 F.2d 1187, 1189 (8th Cir. 1974) (an ALJ need not develop a record further where it is "sufficiently clear to make a fair determination as to whether the claimant is disabled or not").

Second, the ALJ did consider evidence relevant to Plaintiff's intellectual functioning. In particular, the ALJ considered that, although Plaintiff completed twelfth grade, she retained some difficulties, and that her education records reflected that she attended special education classes and that, in the ninth and tenth

grades, she scored well below average in reading, mathematics, science, and social studies.  (Tr. 21).

Third, the ALJ considered that, during Plaintiff's hospitalization, it was noted that she appeared to be in the borderline range of intelligence and she presented with some intellectual limitations.  The ALJ further considered, however, that there was no formal testing within the record, including an IQ assessment, which would verify a diagnosis of borderline intelligence.  (Tr. 21).

Fourth, as noted by the ALJ, even if Plaintiff did have borderline intellectual functioning, borderline intellectual functioning is not listed as a severe impairment. Fifth, the ALJ noted Plaintiff's history of special education classes and stated that her continued difficulty reading and writing would be taken into account.  (Tr. 21). Indeed, the RFC which the ALJ assigned to Plaintiff accommodated her intellectual functioning difficulties, to the extent the ALJ found such difficulties credible, see Tindell v. Barnhart, 444 F.3d 1002, 1007 (8th Cir. 2006) ("The ALJ included all of Tindell's credible limitations in his RFC assessment, and the ALJ's conclusions are supported by substantial evidence in the record."), and limited Plaintiff to simple, routine, repetitive tasks in a relatively static environment with few changes and no fast production pace or stringent production quotas.

Sixth, as discussed above in regard to Plaintiff's credibility, the ALJ considered that Plaintiff's daily activities, including her bird watching and sewing,

required an ability to focus. (Tr. 17, 21). Seventh, the record does not reflect that Plaintiff's counsel ever requested that the ALJ order testing of Plaintiff.

Eighth, to the extent Plaintiff suggests 20 C.F.R. § 404.1529(b) required the ALJ to order intellectual testing of Plaintiff, that Regulation only requires an ALJ to do so where the record, as it exists, is incomplete. Moreover, 20 C.F.R. § 416.919a(b) requires a claimant undergo a consultative examination only to resolve inconsistencies in the record or where further evidence is necessary for the ALJ to determine whether a claimant is disabled. As discussed above, in the instant matter there was no such need as the evidence sufficiently supported the level of Plaintiff's intellectual functioning as incorporated by the ALJ in Plaintiff's RFC.

## C.    Statements of Plaintiff's Friends:

Plaintiff argues the ALJ erred by discounting the opinions of her friends as their opinions were consistent with her caseworker's notes. (Doc. 13 at 14). The ALJ did consider that Plaintiff's friends, Barbara Bright and James Bright, submitted function reports on Plaintiff's behalf. (Tr. 23, 181-89, 219-26). The ALJ noted, however, that these persons were lay witnesses and were not medical or vocational experts capable of determining whether Plaintiff was disabled, or whether she was exaggerating or manipulating for secondary gain. As such, the ALJ held that he did not give significant weight to their statements because these

statements, like Plaintiff's, were not consistent with the preponderance of the opinions and observations of Plaintiff's medical doctors.

While the Eighth Circuit Court of Appeals has frequently criticized the failure of an ALJ to consider subjective testimony of the family and others and while such testimony must be considered, no case directs that reversal is appropriate where an ALJ fails to specifically do so when he has discredited the testimony of the claimant. See e.g., Rautio v. Bowen, 862 F.2d 176, 180 (8th Cir. 1988); Smith v. Heckler, 735 F.2d 312, 317 (8th Cir. 1984). Moreover, the ALJ may discount corroborating testimony on the same basis used to discredit a claimant's testimony. See Black v. Apfel, 143 F.3d 383, 387 (8th Cir. 2006). As stated above, the ALJ discredited the opinions of Barbara Bright and James Bright based on the fact that their opinions were inconsistent with the medical evidence of record, upon which basis the ALJ also discredited Plaintiff. As such, the court finds that the ALJ's failing to give significant weight to the opinions of Barbara Bright and James Bright is consistent with the Regulations and case law, and that it is based on substantial evidence.

**D.    Listings 12.04 and 12.06:**

Plaintiff argues the ALJ erred in failing to find that Plaintiff met Listings 12.04 and 12.06. The court first notes that 20 C.F.R. Ch. lll, Pt. 404, Supt. P, App.1 § 12.00(a) states, in relevant part, that:

The evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s), consideration of the degree of limitation such impairment(s) may impose on your ability to work, and consideration of whether these limitations have lasted or are expected to last for a continuous period of at least 12 months.

Section 12.00(a) further lists mental disorders in diagnostic categories, which include, among others, affective disorders (Listing 12.04) and anxiety-related disorders (Listing 12.06). The Commissioner has supplemented the familiar five-step sequential process for generally evaluating a claimant's eligibility for benefits with additional regulations dealing specifically with mental impairments. 20 C.F.R. § 404.1520a. A special procedure must be followed at each level of administrative review. See Pratt v. Sullivan, 956 F.2d 830, 834 n.8 (8th Cir. 1992) (per curiam).

The mere existence of a mental condition, however, is not per se disabling. See Dunlap v. Harris, 649 F.2d 637, 638 (8th Cir. 1981). The sequential process for evaluating mental impairments is set out in 20 C.F.R. § 404.1520a. This Regulation states that the steps set forth in § 404.1520 also apply to the evaluation of a mental impairment. § 404.1520a(a). However, other considerations are included. The first step is to record pertinent signs, symptoms, and findings to determine if a mental impairment exists. 20 C.F.R. § 404.1520a(b)(1). These are gleaned from a mental status exam or psychiatric history and must be established

by medical evidence consisting of signs, symptoms, and laboratory findings.  20 C.F.R. § 404.1520a(b)(1).

If a mental impairment is found, the ALJ must then analyze whether certain medical findings relevant to ability to work are present or absent.  20 C.F.R. § 404.1520a(b)(1).  The procedure then requires the ALJ to rate the degree of functional loss resulting from the impairment in four areas of function which are deemed essential to work.  20 C.F.R. § 404.1520a(c)(2).  Those areas are: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) deterioration or decompensation in work or work-like settings.  20 C.F.R. § 404.1520a(c)(3).  (For Listing 12.04 <u>see</u> <u>Myers v. Colvin</u>, 721 F.3d 521, 526 (8th Cir. 2013) (where no episodes of decompensation or demonstrated susceptibility to such episodes, to meet paragraph C criteria, claimant must show current history of inability to function outside a highly supportive living arrangement; highly supportive settings include hospitals, halfway houses, care facilities, and personal home settings that "greatly reduce the mental demands place on [the claimant].").

The limitation in the first three functional areas of activities of daily living (social functioning and concentration, persistence, or pace) is assigned a designation of either "none, mild, moderate, marked, [or] extreme."  20 C.F.R. § 404.1520a(c)(4).  The degree of limitation in regard to episodes of decompensation

is determined by application of a four-point scale: "[n]one, one or two, three, four or more." Id. When "the degree of []limitation in the first three functional areas" is "none" or "mild" and "none" in the area of decompensation, impairments are not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in [a claimant's] ability to do basic work activities." 20 C.F.R. § 404.1520a(d)(1). When it is determined that a claimant's mental impairment(s) are severe, the ALJ must next determine whether the impairment(s) meet or are equivalent in severity to a listed mental disorder. This is done by comparing the medical findings about a claimant's impairment(s) and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder. See 20 C.F.R. § 404.1520a(d)(2). If it is determined that a claimant has "a severe mental impairment(s) that neither meets nor is equivalent in severity to any listing," the ALJ must then assess the claimant's RFC. 20 C.F.R. § 404.1520a(d)(3).

The court further notes that 20 C.F.R. Ch. lll, Pt. 404, Supt. P, App.1 § 12.00(a) states, in relevant part, that:

> The evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s), consideration of the degree of limitation such impairment(s) may impose on your ability to work, and consideration of whether these limitations have lasted or are expected to last for a continuous period of at least 12 months.

In particular, Listing 12.04 states:

12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome characterized by at least four of the following:

a. Anhedonia or pervasive loss of interest in almost all activities; or
b. Appetite disturbance with change in weight; or
c. Sleep disturbance; or
d. Psychomotor agitation or retardation; or
e. Decreased energy; or
f. Feelings of guilt or worthlessness; or
g. Difficulty concentrating or thinking; or
h. Thoughts of suicide; or
i. Hallucinations, delusions, or paranoid thinking; or

2. Manic syndrome characterized by at least three of the following:

a. Hyperactivity; or
b. Pressure of speech; or
c. Flight of ideas; or
d. Inflated self-esteem; or
e. Decreased need for sleep; or
f. Easy distractibility; or
g. Involvement in activities that have a high probability of painful consequences which are not recognized; or
h. Hallucinations, delusions or paranoid thinking;

or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);
AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Listing 12.06 states:

12.06 Anxiety Related Disorders:  In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.

A. Medically documented findings of at least one of the following:

1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:

a. Motor tension; or
b. Autonomic hyperactivity; or
c. Apprehensive expectation; or
d. Vigilance and scanning;

or

2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4. Recurrent obsessions or compulsions which are a source of marked distress; or

5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

OR

C. Resulting in complete inability to function independently outside the area of one's home.

As a preliminary matter, as relevant to both Listing 12.04 and 12.06, the ALJ considered whether the requirements of the paragraph B criteria were satisfied, and concluded that they were not. As to activities of daily living, the ALJ concluded that Plaintiff had a mild restriction, noting that her main difficulties in this regard were more related to physical than mental complaints. (Tr. 14-15). As set forth above, the ALJ considered that Plaintiff reported that she could perform a wide range of activities of daily living, including housekeeping, shopping, caring for her own personal needs, and preparing meals, and that she sewed and fished. (Tr. 14-15). The court finds, therefore, that the ALJ's conclusion that Plaintiff had only a mild restriction in this area is based on substantial evidence.

In the area of social functioning, the ALJ concluded Plaintiff had moderate difficulties. (Tr. 15). Social functioning refers to a claimant's "capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(2). As also set forth above, the ALJ considered that, although Plaintiff said she did not like to go out in public, she was able to go out and perform such tasks as grocery shopping, and she was often not home when the therapist arrived for appointments. The ALJ also considered, as set forth above, that, at one appointment, Plaintiff was described as

talkative to the extent she required redirection, but that most often it was reported that her speech was normal. Additionally, there was no indication that Plaintiff was uncooperative during examinations, and the ALJ observed that, at the hearing, she was cooperative, responded appropriately, and maintained an appropriate demeanor. (Tr. 15). Moreover, the State agency examiner found Plaintiff had only moderate difficulties in social functioning. (Tr. 349). See 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i) (State agency medical consultants are highly qualified experts in Social Security disability evaluation; therefore, ALJs must consider their findings as opinion evidence.); Roberson v. Astrue, 481 F.3d 1020, 1025 (8th Cir. 2007) (moderate limitations do not prevent an individual from functioning "satisfactorily"). As such, the court finds that the ALJ's determination that Plaintiff had no more than moderate difficulties in the area of social functioning is based on substantial evidence.

With regard to concentration, persistence, or pace, the ALJ found Plaintiff had only moderate difficulties, despite her assertion that she had great difficulty in this area. (Tr. 15). "Concentration, persistence or pace" is the ability to maintain "focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(3). As discussed above, the ALJ considered that Plaintiff watched television, sewed, fished, and bird watched, and that these

activities demonstrated ability in this area. The court finds, therefore, that the ALJ's determination that Plaintiff had moderate difficulties in this area is based on substantial evidence.

With regard to episodes of decompensation, the ALJ found Plaintiff did not meet this criteria in that, although Plaintiff was hospitalized in July 2011, she was hospitalized only for a few days and not for a period of two weeks, and the record did not reflect any other hospitalizations. (Tr. 15). This portion of the "B" criteria requires that a claimant experience three such episodes within a single year, each lasting for longer than two weeks. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(4). As such, the court finds that the ALJ's determination that Plaintiff did not meet this criteria is based on substantial evidence.

Consistent with the Regulations, the ALJ found that paragraph B criteria were not met because Plaintiff's mental impairments did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of an extended duration. (Tr. 15). See 20 C.F.R. §§ 404.1520a(c)(2) and (d)(1).

Also, consistent with the Regulations, because Plaintiff did not meet either the A or B criteria, the ALJ then proceeded to consider the paragraph C criteria for Listing 12.04 and Listing 12.06, as set forth above, and concluded that the evidence failed to document the required criteria. (Tr. 15-16). Notably, Plaintiff

does not argue that she met the C criteria for Listing 12.04 or Listing 12.06. In any case, the court finds the ALJ's determination that Plaintiff did not meet the C criteria for either Listing is based on substantial evidence and consistent with the Regulations and case law. In conclusion, the court finds that the ALJ's consideration of Listing 12.04 and Listing 12.06 is consistent with the Regulations and case law and based on substantial evidence.

**E.    Dr. Goldman's Opinion:**

In a January 11, 2012 Medical Source Statement of Ability to Do Work-Related Activities (Mental) (the Medical Source Statement), Dr. Goldman opined that Plaintiff was extremely or markedly limited in all areas of consideration, with the exception of his finding that Plaintiff was only moderately limited in regard to Plaintiff's ability to understand, remember, and carry out simple instructions. He also opined that Plaintiff would be unable to retain information, would have difficulty containing her anger, and would have severe difficulty being around others, and that her PTSD would adversely affect her focus, concentration, and memory. (Tr. 372-73). Plaintiff contends that the ALJ erred upon determining that "very little" weight should be given to the limitations imposed by Dr. Goldman in the Medical Source Statement. (Tr. 22). For the following reasons the court finds Plaintiff's argument without merit and that the weight the ALJ gave to Dr. Goldman's opinion is based on substantial evidence.

First, as considered by the ALJ, the limitations imposed by Dr. Goldman in the Medical Source Statement were inconsistent with his own treatment notes. (Tr. 22-23). See Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (upholding the ALJ's decision to discount the treating physician's medical-source statement where limitations were never mentioned in numerous treatment records or supported by any explanation); Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (holding that a treating physician's opinion is given controlling weight "if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence").

In this regard, in July 2011, Dr. Goldman reported, among other things, that Plaintiff was oriented, maintained good eye contact, and, although she was loquacious, she displayed no eccentricities of rate, rhythm, or amplitude. (Tr. 380). Moreover, Dr. Goldman reported, in August and November 2011, that Plaintiff said she was doing better; that Plaintiff was responding well to medication; and that she had no psychosis, was not a suicide risk and had no aggression. (Tr. 378-79). The only abnormality Dr. Goldman noted, in January

2012, was that Plaintiff was loquacious, and, in January 2012, Dr. Goldman noted no abnormalities pursuant to a mental status examination. (Tr. 376-77).

Although Plaintiff argues that Dr. Goldman's "normal" opinions are not as they seem, (Doc. 13 at 11), courts have held that normal findings pursuant to a mental status examination are a sufficient basis upon which an ALJ may discredit a treating doctor's opinion that a claimant is disabled. See, e.g., Mitchell v. Colvin, 2014 WL 65386, at *28 (E.D. Mo. Jan. 8, 2014) (unpublished) (referring to "normal mental status examinations" demonstrating "only mild to moderate symptoms" as substantial evidence to support ALJ's RFC determination); Boling v. Astrue, 2012 WL 1898783, at *4 (W.D. Mo. May 23, 2012) (unpublished) (referring to normal mental status examination as substantial evidence supporting ALJ's decision to discount treating physician's opinion).

Second, the ALJ considered that Dr. Goldman's opinion, as expressed in the Medical Source Statement, appeared to be based on Plaintiff's subjective complaints. (Tr. 22-23). Notably, in the Medical Source Statement, Dr. Goldman quoted Plaintiff as saying, "I can't even remember what you just explained to me," in support of his assertion that she was "unable to retain simple information given to her." (Tr. 372). A treating physician's opinion is not entitled to controlling weight when it is based, in part, on a claimant's subjective complaints. See Renstrom v. Astrue, 680 F.3d 1057, 1064-65 (8th Cir. 2012) (affirming where ALJ

did not give controlling weight to opinion of treating doctor, where doctor's opinion was "largely based on [claimant's] subjective complaints").

Third, the ALJ considered that Dr. Goldman's treatment records deserved to be given greater weight than his opinion as expressed in the Medical Source Statement, because the latter was prepared for purposes of compensation. (Tr. 22-23).

Fourth, the court notes that Dr. Goldman's opinion was inconsistent with Plaintiff's own testimony regarding her activities, as discussed above in regard to Plaintiff's credibility. An ALJ need not accord a treating physician's opinion controlling weight where it is inconsistent with a claimant's own testimony. See Meyers v. Colvin, 721 F.3d 521, 525 (8th Cir. 2013).

Fifth, the ALJ did give some weight to Dr. Goldman's opinion as he limited Plaintiff to work which required only occasional and superficial interaction with others and no interaction with the public. He also limited her to work with few environmental changes and no fast production. See Choate v. Barnhart, 457 F.3d 865, 869-70 (8th Cir. 2006) (holding that the limitations imposed by the ALJ as reflected in the claimant's RFC demonstrating that the ALJ gave some credit to the opinions of the treating physicians); Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005) ("In assessing [the claimant's] RFC, the ALJ determined that [the claimant] could sit for a total of six hours and stand for a total of two hours, but was limited

to sedentary work. This in itself is a significant limitation, which reveals that the ALJ did give some credit to [the treating doctor's] medical opinions.").

Sixth, Dr. Goldman's checkmarks on the Medical Source Statement are not controlling. A treating physician's checkmarks on a form are conclusory opinions which can be discounted if contradicted by other objective medical evidence. See Stormo v. Barnhart, 377 F.3d 801, 805-06 (8th Cir. 2004); Hogan, 239 F.3d at 961; Social Security Ruling (SSR) 96-2p, 1996 WL 374188 (July 2, 1996).

Seventh, to the extent Dr. Goldman opined that Plaintiff was disabled for purposes of Social Security, it is the Commissioner's role to make such a determination. See Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012) (ALJ need not defer to treating doctor's opinion that claimant is totally disabled "because it invades the province of the Commissioner to make the ultimate disability determination"); Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986) (per curiam) ("Even statements made by a claimant's treating physician regarding the existence of a disability have been held to be properly discounted in favor of the contrary medical opinion of a consulting physician where the treating physician's statements were conclusory in nature.").

Eighth, to the extent Plaintiff argues that Dr. Goldman's assigning her a GAF of 45 supported the limitations he imposed on her (Doc. 13 at 10), the ALJ did consider that, after Plaintiff was released from the hospital, in July 2011, Dr.

Goldman reported that she had a GAF of 45 and that this score indicated serious symptoms in social and occupational functioning. Consistent with the case law and Regulations, however, the ALJ further noted that GAF scores are given little weight in the disability process. See <u>Jones v. Astrue</u>, 619 F.3d 963, 974 (8th Cir. 2010) (ALJ may afford greater weight to medical evidence and testimony that to GAF scores); <u>Grim v. Colvin</u>, 2014 WL 859840, at *7-8 (E.D. Mo. Mar. 5, 2014) (unpublished) (ALJ properly found claimant's mental impairments were not serious despite the presence of GAF scores that reflected moderate or serious symptoms).

Further, upon declining to give controlling weight to the GAF score assigned by Dr. Goldman, the ALJ considered that GAF scores do no describe specific work related limitations or objective mental abnormalities. Rather, they consider psychological, social, and occupational functioning, "whereas Social Security is primarily concerned with occupational functioning." The ALJ also noted that GAF descriptions are "short and vague," and "if symptom severity and functioning are discordant, the GAF reflects the lower of the two." The ALJ additionally reasoned that because GAF scores reflect the individual clinician's judgment, "scoring can vary considerably from practitioner to practitioner." (Tr. 19). Thus, the ALJ gave good reasons for discrediting the GAF score of 45 assigned by Dr. Goldman. See <u>Hacker v. Barnhart</u>, 459 F.3d 934, 937 (8th Cir. 2006) (ALJ may elect in certain

circumstances not to give controlling weight to treating physician's opinion, as record must be evaluated as whole; for treating physician's opinion to have controlling weight, it must be supported by medically acceptable diagnostic techniques and not be inconsistent with other substantial evidence in case record; physician's own inconsistency may diminish or eliminate weight accorded to his opinion).

Additionally, upon failing to give controlling weight to Dr. Goldman's GAF assessment, the ALJ correctly cited Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000), where the Commissioner stated that GAF scores do "not have a direct correlation to the severity requirements in our mental disorders listings." (Tr. 15).  See Shrout v. Astrue, 2013 WL 772827, at *16 (E.D. Mo. Jan. 8, 2013) (unpublished) ("[T]he ALJ accurately pointed out that GAF scores are not intended for the assessment of disability.") (citing DeBoard v. Comm'r of Soc. Sec., 211 Fed. Appx. 411, 415 (6th Cir. 2006) (noting that the Commissioner has declined to endorse the GAF scale for use in the disability programs) (citing 65 Fed. Reg. 50746, 50764–65 (Aug. 21, 2000)).

Also, the court notes that although Dr. Goldman assigned Plaintiff a GAF of 45 on July 25, 2011, but on that same date, upon her discharge from the hospital, her GAF was assessed as 50.  (Tr. 382, 465).  See n.5 herein.

Notably, the ALJ gave good reasons for discounting Dr. Goldman's opinion. See 20 C.F.R. §§ 404.1527 and 416.927 (requiring that the ALJ provide "good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s)"). In conclusion, the court finds that the ALJ gave proper weight to Dr. Goldman's GAF assessment and to Dr. Goldman's opinion in its entirety, and that the ALJ's decision, in this regard, is consistent with the Regulations and the case law and that it is based on substantial evidence.

## F. Plaintiff's RFC:

The Regulations define RFC as "what [the claimant] can do" despite his or her "physical or mental limitations." 20 C.F.R. § 404.1545(a). "When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments." Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001). "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). See also Myers v. Colvin, 721 F.3d 521, 526 (8th Cir. 2013).

To determine a claimant's RFC, the ALJ must move, analytically, from ascertaining the true extent of the claimant's impairments to determining the kind

of work the claimant can still do despite his or her impairments. Although assessing a claimant's RFC is primarily the responsibility of the ALJ, a "'claimant's residual functional capacity is a medical question.'" <u>Lauer</u>, 245 F.3d at 704 (quoting <u>Singh v. Apfel</u>, 222 F.3d 448, 451 (8th Cir. 2000)). The Eighth Circuit clarified, in <u>Lauer</u>, 245 F.3d at 704, that "'[s]ome medical evidence,' <u>Dykes v. Apfel</u>, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,' <u>Nevland v. Apfel</u>, 204 F.3d 853, 858 (8th Cir. 2000)." Thus, an ALJ is "required to consider at least some supporting evidence from a professional." <u>Id.</u> <u>See also</u> <u>Vossen v. Astrue</u>, 612 F.3d 1011, 1016 (8th Cir. 2010) ("The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC."); <u>Eichelberger</u>, 390 F.3d at 591.

Consistent with these requirements, the ALJ in the instant matter considered the evidence of record, including the opinions and records of treating and examining doctors and therapists as well as Plaintiff's testimony and reports from her friends. The ALJ also considered the credibility of Plaintiff's allegations and those of her friends and found the severity of Plaintiff's subjective complaints were not fully credible. The court has found above that the ALJ's credibility

determination and the weight he gave to Dr. Goldman's opinion are based on substantial evidence. The court further finds that the ALJ's consideration of all evidence of record is based on substantial evidence.

Indeed, the ALJ evaluated the record as a whole. Only after doing so did the ALJ find that Plaintiff had the following RFC: Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; she could sit, stand and walk, with normal breaks, for a total of 6 hours in an 8-hour workday; she could push and pull within these limitations; she could occasionally climb ramps and stairs, but never ladders, ropes or scaffolds; she could occasionally stoop, kneel, crouch, and crawl; Plaintiff was limited to low stress work, defined as simple, routine, repetitive tasks in a relatively static environment with few changes, and no fast production pace or stringent production quotas; and she worked better with things than with people, but could have occasional and superficial interaction with others, as long as there was no interaction with the public. The court finds that the ALJ's RFC determination is based on substantial evidence.

The ALJ posed a hypothetical to a VE which included all of Plaintiff's credible limitations, see Renstrom v. Astrue, 680 F.3d 1057, 1067 (8th Cir. 2012) (ALJ need only include in hypothetical to VE limitations which he finds credible), and the VE testified that there was work in the national economy which Plaintiff could perform, see Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011) ("Based on

our previous conclusion . . . that 'the ALJ's findings of [the claimant's] RFC are supported by substantial evidence,' we hold that '[t]he hypothetical question was therefore proper, and the VE's answer constituted substantial evidence supporting the Commissioner's denial of benefits.'") (quoting Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006)); Robson v. Astrue, 526 F.3d 389, 392 (8th Cir. 2008) (holding that a VE's testimony is substantial evidence when it is based on an accurately phrased hypothetical capturing the concrete consequences of a claimant's limitations). The ALJ then considered that the VE's testimony was consistent with the Dictionary of Occupational Titles (DOT). As such, the ALJ found Plaintiff not disabled. The court finds that the ALJ's ultimate finding that Plaintiff was not disabled was, therefore, based on substantial evidence and consistent with the Regulations and case law.

## V.
## CONCLUSION

For the reasons set forth above, the court finds that substantial evidence on the record as a whole supports the Commissioner's decision that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by Plaintiff in her Complaint and Brief in Support of Complaint (Docs. 1, 13) is **DENIED**;

**IT IS ORDERED** that a separate judgment be entered incorporating this

Memorandum and Order.

Dated this 8th day of September 2015.

/s/ Noelle C. Collins
UNITED STATES MAGISTRATE JUDGE